UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RAUL VEGA,[1]

        Petitioner,

    v.

WARREN L. MONTGOMERY, Warden,

        Respondent.

Case No. 16-cv-05145-YGR (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; AND DENYING CERTIFICATE OF APPEALABILITY**

Petitioner Raul Vega, a state prisoner currently incarcerated at Calipatria State Prison, brings the instant *pro se* habeas action under 28 U.S.C. § 2254 to challenge his 2013 conviction and sentence rendered in the Sonoma County Superior Court for first degree murder, voluntary manslaughter, and other criminal charges in connection with two gang-related deaths. Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby DENIES the petition for the reasons set forth below.

## I. BACKGROUND

### A. Factual Background

The California Court of Appeal summarized the facts of Petitioner's offenses as follows[2]:

#### A. Prosecution Case

> The crimes at issue here arose out of a rivalry within the Sureños, a street gang controlled by the Mexican Mafia. An expert for the prosecution testified that, by 2009, two rival factions of the Sureños had emerged in Santa Rosa, known as Varrio Sureño Loco (VSL) and Angelino Heights (AH). There was an ongoing turf battle between these two groups over which of them controlled Southwest Community Park in Santa Rosa.
>
> The expert identified defendant as a member of the Sureños. Gang members frequently display gang related tattoos, which they must "earn" by doing something to benefit the gang, such as committing crimes or supplying weapons. Defendant had "AH" and "Angelino" tattoos, indicating he was a member of the AH Sureños faction. The

---

[1] Petitioner is also known as Raul Vega-Vega. *See* Dkt. 6 at 1.

[2] This summary is presumed correct. *See Hernandez v. Small*, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

police believed defendant's gang moniker was "Crime Time."

### 1. The shooting of Dewey Tucker

On January 12, 2010, the police came into possession of a letter written by an imprisoned VSL member calling for the assassination of three senior members of AH—Hector Barragan (Barragan), his brother Marx Barragan, and Miguel Rubio. The letter suggested that if VSL could get rid of these three "old homies," AH would be destroyed. The letter also said Barragan's close friend, Christopher Mancinas, should be killed. Mancinas was an influential Sureño who had spent time in prison and had direct ties to the Mexican Mafia.

The detective who obtained the letter shared its contents in a general way with Barragan on the same date he received it. The letter was not news to Barragan; prior rumors of death threats coming from VSL were known to AH. Barragan and Mancinas called a meeting of AH members at Barragan's house in Santa Rosa to talk about these threats. Mancinas did most of the talking.

Mancinas and Barragan asked defendant—who was 18 years old at the time—to represent AH in connection with the threats. Defendant agreed. Gang experts testified that gangs often select young members to carry out violent crimes, both to give them a chance to "earn their stripes" and to minimize their exposure to punishment (because any sentences imposed on them will likely be lower than their more hardened gang associates would receive).

Mancinas asked defendant to name the person he trusted most to help with the operation, and he chose Javier Carreon-Lopez, a lifelong friend whom defendant loved like a brother. On January 12, 2010, defendant, Carreon-Lopez, Barragan and Mancinas drove to Petaluma, where they retrieved at least three guns ("straps"). They were in a Chevy Tahoe SUV that Mancinas had borrowed from his sometime girlfriend, who lived in Rohnert Park.

The four of them then headed to Vallejo, where a member of VSL named Ramon Ochoa lived. They were planning to target either Ochoa or another VSL member, Vincente Tapia, but Ochoa was the "main target." For defendant, killing Ochoa would avenge the death of Alejandro Ortega, a member of AH and a friend of defendant's, who had been killed by VSL in November 2009.

In Vallejo, the four met up with two other AH members called "Smokes" and "Huero," who lived in Vallejo and had been staking out Ochoa and Tapia on Mancinas's instruction. Smokes and Huero had reported back that they knew where one of the VSL members lived. Mancinas gave defendant a loaded gun, a black or grayish semiautomatic handgun, either a .40 or .45 caliber.

When the two AH groups converged in Vallejo they switched cars. From that point, defendant and Carreon-Lopez were in a Honda that Smokes or Huero had stolen in Vallejo earlier that day. They drove to Tapia's apartment building in two cars, with Carreon-Lopez driving the Honda and defendant in the passenger seat. Barragan

2

and Mancinas were in the Tahoe along with Smokes and Huero.

Both cars stopped outside Tapia's apartment complex, where Mancinas pointed out a white car coming out of the driveway. He phoned defendant and said Ochoa was in that car and they should follow it. They followed the white car as it left Vallejo and headed south on Interstate 80. Defendant admitted to police that once he caught up to the white car on the freeway, he fired at least two shots at the driver, believing it was Ochoa.

Defendant told police he knew the gunfire struck its intended target because the driver slumped over in the car. The white car, which had just crossed the Carquinez Bridge, collided with the center divider, then swerved to the shoulder of the highway. Defendant and Carreon-Lopez then returned to Santa Rosa, dumping the Honda along the way. Defendant's brother sent "some girl" to pick them up. Afterwards, they met up with Barragan in a park in Santa Rosa.

Tragically, it turned out, defendant's shots found the wrong target. What had been planned as a preemptive revenge killing against a gang rival was a case of mistaken identity. The gunshot victim was Dewey Tucker, who had the misfortune of living in the apartment just above Tapia's. Tucker was a professional musician who was on his way to practice with his band in Oakland. A bullet entered Tucker's left ear and exited his right ear, killing him at the scene.

### 2. The stabbing of Juan Carlos Angel-Esparza

About a year after Tucker's murder, on January 8, 2011, Juan Carlos Angel-Esparza was stabbed to death on the grounds of Kawana Springs Elementary School (Kawana Springs) in Santa Rosa, which is two or three miles from Southwest Community Park. Late that afternoon, Angel-Esparza had been hanging out at Kawana Springs, smoking marijuana and talking about football with his friends Ezequiel Corona and Edgar Sonato-Vega.[FN 2]

[FN 2:] Sonato-Vega is not related to defendant, but both Sonato-Vega and Corona knew Vega, since they all lived on the same street when they were younger.

Corona and Sonato-Vega, who had no gang affiliation, testified that two men entered the school grounds from the rear of the school. Angel-Esparza approached them, while Sonato-Vega and Corona hung back, continuing to smoke marijuana. One or both of the men asked Angel-Esparza where he was from. In gang culture, asking that question of a suspected gang rival is commonly understood as a verbal provocation, a challenge to fight. In response, Angel-Esparza said, "VSL."

A fight then broke out between Angel-Esparza and one of the two newcomers. Sonato-Vega told police that defendant was the person with whom Angel-Esparza was fighting, but at trial he claimed not to know who the other combatant was. At trial Corona also claimed no knowledge of the other combatant. The evidence at trial was similarly mixed as to who issued the original provocation—Angel-Esparza; both defendant and his companion; or just defendant.

Sonato-Vega testified to seeing Angel-Esparza pull a knife as the fight was breaking up, but he did not see a knife in defendant's hands. Corona testified that he did not see anyone with a knife until after Angel-Esparza and defendant separated, and it appeared Angel-Esparza was hurt. That is when Angel-Esparza pulled out a Dallas Cowboys pocket knife and moved toward defendant with it, as defendant backed away. Toward the end of the fight sirens started blaring. Angel-Esparza and defendant backed away from one another and ran off in opposite directions.

Angel-Esparza ran to the front of the school and collapsed in a breezeway, while defendant and his companion left the area through the rear. Sonato-Vega and Corona went to Angel-Esparza's side, and he told them to call an ambulance, so they called 911. Sonato-Vega took Angel-Esparza's Cowboys knife and threw it on the roof of the school, where it was later recovered by the police. Angel-Esparza was taken by ambulance to the hospital, where he died shortly thereafter from three stab wounds, including one directly to the heart and one to the liver.

Before the police arrived, Corona and Sonato-Vega made a plan to say they had not witnessed the fight and had just found Angel-Esparza lying on the school grounds. During questioning later that night, however, Corona eventually admitted to the police that he had heard gang challenges to Angel-Esparza before the fight, had heard Angel-Esparza claim "VSL," and had seen the fight.

At one point, while they were at the police station, Corona and Sonato-Vega were placed in a room alone together, where they were video recorded. Sonato-Vega asked Corona, "Did you tell them it was Raul?" This was the break in the case that first alerted police to defendant's involvement, as one of the officers was familiar with defendant and his gang affiliation.

Police investigating the stabbing found two knives in the vicinity— one was a pocket knife with a locking blade and a Dallas Cowboys logo on it, which belonged to Angel-Esparza and was found on the roof of the school. It was covered in blood, which proved to be Angel-Esparza's. Angel-Esparza's thumbprint was also found on the knife, but defendant's prints were not. A second knife located at the scene was a blade without a handle, which had no blood on it.[FN 3] There was a small amount of blood on the pathway near where the fight had occurred, and it proved to be defendant's.

[FN 3:] The prosecutor theorized at trial that neither of the knives found at the scene was the one that killed Angel-Esparza. He suggested to the jury that defendant had brought his own knife to the school grounds and may have been the first to draw a weapon.

### 3. Defendant's incriminating statements to police

When defendant was questioned by the police two days after Angel-Esparza's death, he initially denied involvement, but eventually admitted fighting with Angel-Esparza. He claimed the killing was in self-defense because Angel-Esparza pulled a knife. Defendant

said he took the knife from Angel-Esparza, but Angel-Esparza had another one. Angel-Esparza said he was a member of VSL, and defendant believed Angel-Esparza attacked him because of defendant's AH affiliation.

Defendant claimed that when Angel-Esparza attacked him, he suffered a cut to the face and thought he was going to be killed, but he managed to wrestle the knife away from Angel-Esparza and push it towards him, evidently sticking him with it. Defendant admitted a friend was with him at Kawana Springs that day, but he did not give the police the friend's name. He did not implicate his friend in the fight and told them his friend "is not a banger."

After Vega finished his interview with the Santa Rosa police, representatives of the Sonoma County Sheriff's Office and the California Highway Patrol interviewed him about the Tucker murder. It was during this interview that defendant made statements placing himself at the scene of the shooting and admitting to having been the triggerman. Among other things, he also described himself as a "killer," and claimed to have "stabbed a lot of people" before. He showed police a tattoo of a left-handed gunman.[FN 4] He said he had earned it by killing Tucker.

[FN 4:] Vega is left-handed.

In addition, defendant made a number of damaging admissions concerning his cell phone. On the date of Tucker's murder, 12 calls were made between Vega's phone and a cell phone used by Mancinas. The phone the police associated with defendant had been purchased in the name "Crime Time." Vega confirmed during his police interview that the phone was his. He further admitted he and Mancinas were phoning back and forth to each other during the events surrounding the killing.

Cell phone evidence at trial showed that Mancinas's cell phone was in Petaluma, where he lived, until 6:23 p.m. on January 12, 2010. At 6:24 p.m. Mancinas's phone traveled north on Highway 101 and was in Rohnert Park, where Mancinas's girlfriend lived, at 6:36 p.m. At 7:53 p.m. his phone was on the south end of Santa Rosa, and at 8:43 p.m. it was in Vallejo.

At 9:18 and 9:36 p.m. the phone was traveling further east in Vallejo, toward Tapia's apartment complex. Two calls were made in the vicinity of the apartments. At 9:49 the phone was moving south along Interstate 80, and at 9:51 it crossed the Carquinez Bridge. Near the place where Tucker's car had come to rest, Mancinas's phone crossed paths with defendant's phone. At 9:54 p.m., the phone was headed in the opposite direction, back over the Carquinez Bridge, through Vallejo and back to Petaluma by 10:45 p.m. At 10:59 p.m. his phone was back in Rohnert Park. Mancinas's girlfriend confirmed that Mancinas had borrowed her Tahoe that night, as he sometimes did for gang "business," and he returned it about 10:00 or 11:00 p.m.

In May 2010, police searched an apartment occupied by suspected members of the Sureños and found a .40-caliber handgun. Two

5

shell casings recovered at the scene of Tucker's killing were determined to have been fired from that handgun. An expert testified that gangs often have "gang guns" which they pass from one member to another and use for self-defense or to commit crimes for the gang.

## B. Defendant's Trial Testimony

At trial, defendant's version of the events surrounding the stabbing of Angel-Esparza closely tracked the version he gave the police. Things began when he and a friend, Giovanni, went to Kawana Springs to hang out. As he and Giovanni entered the school from the rear, they saw three or four other people on the school grounds. Defendant recognized Corona and Sonato-Vega, each of whom he had known from growing up in the same neighborhood.

Defendant testified that he and Giovanni had gone to Kawana Springs to unwind after he got off work. They had not seen each other in three to six months and were looking forward to catching up. He did not tell the police Giovanni's name because he did not want to get him in trouble or get him deported. After he and Giovanni arrived at Kawana Springs, Angel-Esparza approached him and asked where he was from, whether he was a "northerner," and whether he was "AH." Angel-Esparza said he was "VSL."

Although he knew Kawana Springs was a place frequented by gang members where fights often occurred, defendant denied having a knife when he went to Kawana Springs. After Angel-Esparza approached him and provoked the confrontation, he and Angel-Esparza began fighting, at first only with fists. Defendant did not remember who threw the first punch. At first defendant did not see any weapons in Angel-Esparza's hands. Angel-Esparza kicked defendant in the groin and he fell to his knees. At that point he saw a knife in Angel-Esparza's hand and tried to block it, but Angel-Esparza cut defendant's lip with it.

Fearing he would be stabbed in the face or head, defendant wrestled the knife away from Angel-Esparza, pushed it toward Angel-Esparza, and the knife blade broke. Angel-Esparza then pulled out a second knife, a pocket knife. Defendant testified he backed away, but Angel-Esparza kept coming at him with the second knife. Although defendant claimed he did not know that Angel-Esparza had been stabbed, he saw Angel-Esparza grab his chest, bend over, and run toward the front of the school. He and Giovanni ran the other way.

Defendant's handling of the Tucker murder in his trial testimony, by contrast, diverged sharply from what he told the police. Defendant testified he did not kill Tucker and knew nothing about the killing. He said he had never owned a gun and had not owned a cell phone until long after the Tucker murder. He denied going by the name "Crime Time," claiming his nicknames were "Chonga" and "Crime."

Defendant denied being in Vallejo in January 2010. He testified he did not personally know Barragan or Mancinas, although he had

6

heard of them. He claimed that whatever details he provided to the police during his interview about the Tucker killing reflected simply what he had learned from them during the interview. Defendant said his statement to the police had been aimed at telling them "what they wanted to hear" and whatever "sounded good."

On cross-examination defendant admitted he initially lied to the police in claiming he knew nothing about the death of Angel-Esparza. He admitted his tattoos were "gang tattoos," that he was a member of AH, that he had been involved with gangs since he was 12 or 13 years old, and that he was proud to be a member of AH.

*People v. Vega*, 236 Cal. App. 4th 484, 487-93 (2015).

## B. Procedural History

### 1. Conviction and Sentence

Petitioner was charged by a fourth amended information filed on September 7, 2012 in Sonoma County Superior Court case number SCR595589 as follows: two counts of murder (Cal. Penal Code § 187); one count of discharging a firearm at an inhabited vehicle (Cal. Penal Code § 246) in connection with the death of Dewey Tucker ("Tucker"); and two counts of active participation in a criminal street gang on the dates of the two murders (Cal. Penal Code § 186.22(a)). 3 Clerk's Transcript ("CT") 562-566. With respect to the Tucker murder and the section 246 offense, the fourth amended information also alleged enhancements based on firearm use, discharge, and discharge causing great bodily injury or death (former Cal. Penal Code §§ 12022.53(b), (c), (d), & (e)(1)), along with gang enhancements (Cal. Penal Code §§ 186.22(b)(1)(C) & (b)(4)), and with respect to the murder, two special circumstance allegations: gang-related murder (Cal. Penal Code § 190.2(a)(22)) and murder by discharge of a firearm from a motor vehicle (Cal. Penal Code § 190.2(a)(21)). 3CT 562-564. In connection with the death of Juan Carlos Angel-Esparza ("Angel-Esparza"), the charges included a gang enhancement (Cal. Penal Code § 186.22(b)(l)(C)) and an enhancement for personal use of a deadly weapon (a knife) (former Cal. Penal Code § 12022(b)(1)). 3CT 564-566.

The case was submitted to the jury on October 15, 2012. 3CT 617. In addition to instructions on the charged offenses, the jury was instructed on perfect and imperfect self-defense, as well as heat of passion voluntary manslaughter. 3CT 632-669. On October 15, 2012, after more than thirty hours over eight days, the jury found Petitioner guilty of first degree murder of

Tucker (count one) and voluntary manslaughter for the death of Angel-Esparza (count three). 3CT 626-629, 688, 694. The jury also found him guilty of shooting at an occupied vehicle (count two) and two counts of gang participation (counts four and five). 3CT 626-629, 686-687, 692, 695. It further found true all of the alleged enhancements and special circumstances, except it deadlocked on the gang enhancement on the killing of Angel-Esparza. 3CT 626-629, 689, 693, 696.

On March 11, 2013, in light of the special circumstance findings, the court sentenced Petitioner to life in prison without the possibility of parole for the murder of Tucker, with a twenty-five-to-life consecutive term for firearm discharge causing great bodily injury or death, plus a sentence of life with the possibility of parole for shooting at an occupied vehicle, with all punishment on count two stayed under California Penal Code § 654. 3CT 761-764. The court stayed the remaining gang and firearm enhancements. 3CT 761-764. It further sentenced Petitioner to twelve years for the voluntary manslaughter of Angel-Esparza. 3CT 761-764. Lastly, the trial court sentenced Petitioner to three years (concurrent) on each of the substantive gang participation offenses and stayed those terms under California Penal Code § 654. 3CT 761-764.

### 2. Post-Conviction Appeals

Petitioner timely appealed the judgment to the California Court of Appeal on October 1, 2013. Resp't Ex. 3. In a published, reasoned decision issued on May 1, 2015, the state appellate court reversed one of the counts of active participation in a criminal street gang (count five), ordered that the abstract of judgment be corrected to reflect accurately the trial court's oral pronouncement of judgment, and otherwise affirmed the judgment. *See Vega*, 236 Cal. App. 4th at 507; Resp't Ex. 6. The California Supreme Court thereafter summarily denied his petition for review. Resp't Ex. 8; *see also* Dkt. 1 at 7.[3]

On September 7, 2016, Petitioner filed the instant federal habeas petition in this Court raising one claim of instructional error. Dkts 1, 6.[4] In an Order dated November 8, 2016, the

---

[3] Page number citations refer to those assigned by the Court's electronic case management filing system and not those assigned by the parties.

[4] Petitioner's initial filing was missing the first page. Dkt. 1. The Clerk of the Court

1  Court ordered Respondent to show cause why the petition should not be granted.  Dkt. 7.

2  Respondent filed an Answer and Memorandum of Points and Authorities in support thereof.  Dkts.

3  12; 12-1.  Petitioner has not filed a Traverse, and the time frame for doing so has passed.  *See* dkt.

4  1.  The matter is fully briefed and ripe for adjudication.

5  **II.     LEGAL STANDARD**

6          A federal court may entertain a habeas petition from a state prisoner "only on the ground

7  that he is in custody in violation of the Constitution or laws or treaties of the United States."  28

8  U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996,

9  a district court may not grant a petition challenging a state conviction or sentence on the basis of a

10  claim that was reviewed on the merits in state court unless the state court's adjudication of the

11  claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of,

12  clearly established Federal law, as determined by the Supreme Court of the United States; or

13  (2) resulted in a decision that was based on an unreasonable determination of the facts in light of

14  the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  The first prong

15  applies both to questions of law and to mixed questions of law and fact, *see Williams (Terry) v.*

16  *Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual

17  determinations, s*ee Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

18          A state court decision is "contrary to" Supreme Court authority, and thus falls under the

19  first clause of section 2254(d)(1), only if "the state court arrives at a conclusion opposite to that

20  reached by [the Supreme] Court on a question of law or if the state court decides a case differently

21  than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams (Terry)*, 529

22  U.S. at 412-13.  A state court decision is an "unreasonable application of" Supreme Court

23  authority, falling under the second clause of section 2254(d)(1), if it correctly identifies the

24  governing legal principle from the Supreme Court's decisions but "unreasonably applies that

25  principle to the facts of the prisoner's case."  *Id.* at 413.  The federal court on habeas review may

26  not issue the writ "simply because that court concludes in its independent judgment that the

27

28  instructed Petitioner to fill out the first page of a blank habeas petition form.  Dkt. 4.  Thereafter,
    on October 14, 2016, Petitioner filed the first page of his petition.  Dkt. 6.

relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *See Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000). Moreover, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Even if constitutional error is established, habeas relief is warranted only if the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Penry v. Johnson*, 532 U.S. 782, 795-96 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)).

On federal habeas review, AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). In applying the above standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000). Thus, a federal court will "look through" the unexplained orders of the state courts rejecting a petitioner's claims and analyze whether the last reasoned opinion of the state court unreasonably applied Supreme Court precedent. *See Ylst*, 501 U.S. at 804-06; *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000). The last reasoned decision in this case is the state appellate court's disposition issued on August 12, 2015, in which that court considered Petitioner's claim of instructional error. *See* Resp't Ex. 6; *Vega*, 236 Cal. App. 4th at 494-506.

10

### III. INSTRUCTIONAL ERROR CLAIM

Petitioner's sole claim on federal habeas is that the trial court violated of his constitutional rights by improperly instructing the jury with CALCRIM No. 361, which is entitled "Defendant's Failure to Explain or Deny Adverse Evidence." Dkt. 1 at 4, 9-12; *see also* dkt. 12-1 at 11. Petitioner alleges that that CALCRIM No. 361 is constitutionally infirm and specifically, that its use in his trial violated his "Fifth Amendment Right to testify in his own defense," and his "Fifth and Fourteenth Amendment Right[s] to a fair trial." Dkt. 1 at 4, 11-12.

#### A. Background Facts and State Court Opinion

CALCRIM No. 361, which relates to a defendant's failure to explain or deny adverse testimony, states as follows:

> If the defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt.
>
> If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure.

3CT 643; 8RT 2137. CALCRIM No. 361 serves the important function of conveying to the jury the "well settled rule that a defendant who takes the stand and testifies in his behalf waives his Fifth Amendment privilege [citation] and his state constitutional privilege to the extent of the scope of relevant cross-examination." *See People v. Saddler*, 24 Cal. 3d 671, 679 (1979) (internal citations omitted); *People v. Rodriguez*, 170 Cal. App. 4th 1062, 1066 (2009). As mentioned above, Petitioner in the instant matter took the stand to testify that: (1) he did not intentionally stab Angel-Esparza, but rather fought him with his fists in self-defense after Angel-Esparza attacked with two knives, one of which Petitioner took control of and pushed toward Angel-Esparza; and (2) he did not kill Tucker and knew nothing about the killing. 8RT 2021-2035, 2042-2051, 2063-2064, 2073-2074, 2102-2103, 2115.

The state appellate court gave the following background relating to Petitioner's challenge to CALCRIM No. 361 and first considered whether defense counsel's failure to object to this instruction amounted to forfeiture, stating as follows:

> Defense counsel did not object to [CALCRIM No. 361], and in fact, agreed it should be given if defendant testified. The Attorney General therefore contends any claim of instructional error was forfeited. Generally, failure to object does not waive an instructional error on appeal if the instruction was an incorrect statement of law or the defendant's substantial rights were affected. (§ 1259; *People v. Fiore* (2014) 227 Cal. App. 4th 1362, 1377-1378, 174 Cal. Rptr. 3d 806.) The invited error doctrine likewise poses no obstacle to raising a claim of instructional error on appeal, unless there was a conscious, deliberate or tactical reason stated for the appellant's acquiescence in the instruction at trial. (*People v. Hernandez* (1988) 47 Cal. 3d 315, 353, 253 Cal. Rptr. 199, 763 P.2d 1289; *People v. Collins* (1992) 10 Cal. App. 4th 690, 694-695, 12 Cal. Rptr. 2d 768.)

*Vega*, 236 Cal. App. 4th at 495 (brackets added). The state appellate court then determined that even if the trial court had erred in giving CALCRIM No. 361, no prejudice resulted, stating:

> We ultimately conclude the claimed error could not have been prejudicial on counts one and two due to the strength of the evidence, and was not prejudicial as to count three due to the conviction of a lesser offense on that charge. Nevertheless, we address the merits of defendant's attack on CALCRIM No. 361 because he claims it incorrectly states the law and in order to forestall a future claim of ineffective assistance of counsel. (*People v. Fiore*, supra, 227 Cal. App. 4th at pp. 1377-1378 & fn. 10, 174 Cal. Rptr. 3d 806.) We employ de novo review for a claim of instructional error of this nature. (*People v. Posey* (2004) 32 Cal. 4th 193, 218, 8 Cal. Rptr. 3d 551, 82 P. 3d 755; *People v. Rodriguez* (2009) 170 Cal. App. 4th 1062, 1066, 88 Cal. Rptr. 3d 749.)

*Id.*

The state appellate court then addressed the merits of Petitioner's instructional error claim and found that it was not unconstitutional and that any error in giving CALCRIM No. 361 was harmless.[5] *Id.* at 495-503. First, the state appellate court addressed the constitutionality of CALCRIM No. 361. The state appellate court noted that CALCRIM No. 361 was similar in content to CALJIC No. 2.62. *Id.* at 495-96. The state appellate court explained that as with CALJIC No. 2.62, CALCRIM No. 361 suffered no constitutional or other infirmities and may be given in the appropriate case, stating as follows:

> In addressing the constitutionality of CALCRIM No. 361, we do not

---

[5] The state appellate court also addressed Petitioner's argument relating to the lack of evidence supporting CALCRIM No. 361. *See Vega*, 236 Cal. App. 4th at 500-01. However, the record shows that Petitioner did not raise this evidentiary argument in his instant federal habeas petition. *See* Dkts. 1, 6. Therefore, the Court need not address such an argument and omits the portion of the state appellate court opinion relating to it.

write on a clean slate. In *People v. Saddler* (1979) 24 Cal. 3d 671, 675, 678-681, 156 Cal. Rptr. 871, 597 P.2d 130 (*Saddler*), our Supreme Court upheld the constitutionality of CALJIC No. 2.62, a pattern instruction similar in substance to CALCRIM No. 361.[FN 5]. More recently, in *People v. Rodriguez, supra*, 170 Cal. App. 4th at pp. 1067-1068, 88 Cal. Rptr. 3d 749 (*Rodriguez*), Division Four of the Second District Court of Appeal rejected a constitutional challenge to CALCRIM No. 361. Defendant advances arguments similar to those made and rejected in *Saddler* and virtually identical to those made and rejected in *Rodriguez*. He asks us to depart from the path taken in those cases, but we decline to do so.

[FN 5:] CALJIC No. 2.62 reads as follows: "In this case defendant has testified to certain matters. [¶] If you find that [a] [the] defendant failed to explain or deny any evidence against [him] [her] introduced by the prosecution which [he] [she] can reasonably be expected to deny or explain because of facts within [his] [her] knowledge, you may take that failure into consideration as tending to indicate the truth of this evidence and as indicating that among the inferences that may reasonably be drawn therefrom those unfavorable to the defendant are the more probable. [¶] The failure of a defendant to deny or explain evidence against [him] [her] does not, by itself, warrant an inference of guilt, nor does it relieve the prosecution of its burden of proving every essential element of the crime and the guilt of the defendant beyond a reasonable doubt. [¶] If a defendant does not have the knowledge that [he] [she] would need to deny or to explain evidence against [him,] [her,] it would be unreasonable to draw an inference unfavorable to [him] [her] because of [his] [her] failure to deny or explain this evidence."

CALCRIM No. 361 rests on the logical inference that if a person charged with a crime is given the opportunity to explain or deny evidence against him but fails to do so (or gives an implausible explanation), then that evidence may be entitled to added weight. The defendant in *Saddler* argued that CALJIC No. 2.62 compromised his privilege against self-incrimination. (*Saddler, supra*, 24 Cal. 3d at p. 678, 156 Cal. Rptr. 871, 597 P.2d 130.) In this case, defendant claims it violated his right to testify, citing *People v. Gutierrez* (2009) 45 Cal. 4th 789, 821, 89 Cal. Rptr. 3d 225, 200 P.3d 847, and his right to a fair trial, citing *Duncan v. Louisiana* (1968) 391 U.S. 145, 148-149, 88 S. Ct. 1444, 20 L.Ed.2d 491 [right to jury trial]. Using these bedrock procedural protections as a foundation, defendant builds an argument that it was fundamentally unfair to tell jurors they could draw reasonable factual inferences against him based on unsatisfactory and implausible answers to questions during his testimony.

We see no inconsistency between defendant's right to testify and the attendant risk of being confronted with evidence calling into question his testimony. The failure to explain or deny adverse evidence can be a basis for disbelieving any witness's testimony and is always relevant to credibility. (See CALCRIM No. 226 [factors jury may consider in evaluating witnesses' testimony include: "Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony? [¶] How reasonable is the testimony when you consider all the other evidence in the case? [¶]

[Did other evidence prove or disprove any fact about which the witness testified?]".) In that sense, CALCRIM No. 361 represents nothing more than a specific application of a general rule applicable to all witnesses.

*Saddler* referred to CALJIC No. 2.62 as "the comment rule," which, prior to the Supreme Court's decision in *Griffin v. California* (1965) 380 U.S. 609, 85 S. Ct. 1229, 14 L.Ed.2d 106 (*Griffin*), historically allowed the trial judge to comment on a defendant's failure to explain or deny incriminating evidence. (*Saddler*, *supra*, 24 Cal. 3d at p. 680, 156 Cal. Rptr. 871, 597 P.2d 130.) For many years, the "comment rule" was codified in former Article I, section 13 of the California Constitution. (*Id.* at p. 678 & fn. 5, 156 Cal. Rptr. 871, 597 P.2d 130). *Griffin* found a Fifth Amendment violation where, pursuant to Article I, section 13 as it then stood, a jury was instructed it may consider, and the prosecutor commented upon, the defendant's failure to testify.[FN 6] (*Griffin*, *supra*, 380 U.S. at pp. 612-615, 85 S. Ct. 1229.)

[FN 6:] The instruction given by the court in *Griffin* was as follows: "As to any evidence or facts against him which the defendant can reasonably be expected to deny or explain because of facts within his knowledge, if he does not testify or if, though he does testify, he fails to deny or explain such evidence, the jury may take that failure into consideration as tending to indicate the truth of such evidence and as indicating that among the inferences that may be reasonably drawn therefrom those unfavorable to the defendant are the more probable." (*Griffin*, *supra*, 380 U.S. at p. 610, 85 S. Ct. 1229.)

Former Article I, section 13 was repealed in 1974 and its text restated in Article I, section 15, with no reference to the comment rule. However, the rule survives today in section 1127, which provides in part that the trial court, in instructing the jury, "may make such comment on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the case and in any criminal case, whether the defendant testifies or not, his failure to explain or to deny by his testimony any evidence or facts in the case against him may be commented upon by the court." (See Evid. Code, § 413 [trier of fact may consider any "party's failure to explain or to deny by his testimony such evidence or facts in the case against him"].) To the extent the language of section 1127 can be read to allow judicial comment when a defendant declines to testify, its validity is not before us. But when a defendant does testify, all bets are off. He waives his Fifth Amendment privilege (*Saddler*, *supra*, 24 Cal. 3d at p. 679, 156 Cal. Rptr. 871, 597 P.2d 130) and is subject to cross-examination just as any other witness is. (*People v. Wagner* (1975) 13 Cal. 3d 612, 618, 119 Cal. Rptr. 457, 532 P.2d 105; *People v. Zerillo* (1950) 36 Cal. 2d 222, 227-229, 223 P.2d 223.)

Defendant relies in part on a case critical of CALJIC No. 2.62, *People v. Haynes* (1983) 148 Cal. App. 3d 1117, 1119-1120, 196 Cal. Rptr. 450 (*Haynes*), in which the court suggested it would be "unwise" to give CALJIC No. 2.62 without inquiring as to the position of the parties (which the trial court did here), and said it should only be used if the defendant's testimony included significant

14

omissions or failure to explain or deny. (*Id.* at pp. 1119-1120, 196 Cal. Rptr. 450).  As we will discuss further, the *Haynes* prerequisites existed in this case.

The criticism expressed in *Haynes*—and its proposed limitations on the instruction's use—have been taken to heart in subsequent cases. CALCRIM No. 361 is not to be given every time a defendant testifies.  Rather, the courts long ago imposed limits on the circumstances under which CALJIC No. 2.62 may be given, and the Bench Notes to CALCRIM No. 361 indicate the same restrictions apply in using CALCRIM No. 361.  (Judicial Council of Cal. Crim. Jury Instns. (2015) Bench Notes to CALCRIM No. 361, pp. 168-169.)  "If a defendant has not been asked an appropriate question calling for either an explanation or denial, the instruction cannot be given, as a matter of law."  (*People v. Roehler* (1985) 167 Cal. App. 3d 353, 392, 213 Cal. Rptr. 353 [CALJIC No. 2.62]; accord, *People v. Mask* (1986) 188 Cal. App. 3d 450, 455, 233 Cal. Rptr. 181 [CALJIC No. 2.62].)

When a defendant testifies, however, and "fails to deny or explain inculpatory evidence or gives a 'bizarre or implausible' explanation, the instruction is proper." (*People v. Sanchez* (1994) 24 Cal. App. 4th 1012, 1029-1031, 30 Cal. Rptr. 2d 111 [CALJIC No. 2.62]; accord, *People v. Mask, supra,* 188 Cal. App. 3d at p. 455, 233 Cal. Rptr. 181 [CALJIC No. 2.62 is warranted "if the defendant tenders an explanation which, while superficially accounting for his activities, nevertheless seems bizarre or implausible"]; *People v. Belmontes* (1988) 45 Cal. 3d 744, 784, 248 Cal. Rptr. 126, 755 P.2d 310, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal. 4th 390, 421, fn. 22, 87 Cal. Rptr. 3d 209, 198 P.3d 11; *People v. Roehler, supra,* 167 Cal. App. 3d at p. 393, 213 Cal. Rptr. 353.)

In an effort to persuade us that this case should not be governed by the legal framework established in *Saddler* and *Rodriguez,* defendant adds the twist that the existence of CALCRIM No. 361 and its possible use at trial could have a "chilling effect" on defendants generally and dissuade them from testifying.  The idea that a "chilling effect" on others not before the court should be taken into account in constitutional adjudication is familiar from First Amendment overbreadth and vagueness doctrines (see, e.g., *People ex rel. Gallo v. Acuna* (1997) 14 Cal. 4th 1090, 1114, 60 Cal. Rptr. 2d 277, 929 P.2d 596; *Concerned Dog Owners of California v. City of Los Angeles* (2011) 194 Cal. App. 4th 1219, 1230-1232, 123 Cal. Rptr. 3d 774), a setting where questions often arise about whether those whose voices are potentially stifled by overbroad or vague regulation of free expression will be motivated to bring constitutional challenges.  But that mode of analysis seems a poor fit here.

Even assuming an undue "chilling effect" on the procedural rights of criminal defendants generally may properly be raised as a basis for challenging a jury instruction (see *People v. Beyah* (2009) 170 Cal. App. 4th 1241, 1248-1250, 88 Cal. Rptr. 3d 829), we think it unlikely that CALCRIM No. 361 would have that effect beyond the ever-present prospect of facing cross examination.  It certainly did not have that effect here.  The jury instructions in this case were

settled before defendant took the stand. Thus, defendant testified at length despite the knowledge in advance that he would face this instruction, and his counsel acquiesced.

Defendant further contends the giving of CALCRIM No. 361 violated his due process rights by depriving him of a fundamentally fair trial. (U.S. Const., amends. V, XIV.) In this thread of his argument, defendant characterizes CALCRIM No. 361 as a pinpoint instruction that singled him out for treatment different from that of other witnesses. (See *People v. Harris* (1989) 47 Cal. 3d 1047, 1099, 255 Cal. Rptr. 352, 767 P.2d 619 [improper for court to "single out a particular witness in an instruction"].) The unfair "singling out" complaint advanced by defendant was rejected in *Saddler*, *supra*, 24 Cal. 3d at pages 680-681, 156 Cal. Rptr. 871, 597 P.2d 130, and *Rodriguez*, *supra*, 170 Cal. App. 4th at page 1067, 88 Cal. Rptr. 3d 749, and we likewise reject it here.

The response to that argument can be traced to *Caminetti v. United States* (1917) 242 U.S. 470, 493, 37 S. Ct. 192, 61 L.Ed. 442 (*Caminetti*), where the United States Supreme Court said that an accused who takes the stand "subjects himself to the same rule as that applying to any other witness." The court explained that "where the accused takes the stand in his own behalf and voluntarily testifies for himself . . . he may not stop short in his testimony by omitting and failing to explain incriminating circumstances and events already in evidence, in which he participated and concerning which he is fully informed, without subjecting his silence to the inferences to be naturally drawn from it." (*Id.* at p. 494, 37 S. Ct. 192.)

As our Supreme Court noted more recently in *Saddler*—specifically addressing the identical issue raised here—"Defendant . . . argues that the challenged instruction should never be given because it impermissibly singles out a defendant's testimony and unduly focuses upon it. The same argument was rejected in *People v. Mayberry* [(1975)] 15 Cal. 3d 143, 161 [125 Cal. Rptr. 745, 542 P.2d 1337]. We noted there that the instruction was consistent with Evidence Code [§] 413, which permits the drawing of inferences from any party's failure to explain or deny evidence against him. Since the only testifying 'party' in a criminal case is the defendant, the code section can have reference only to him." (*Saddler*, *supra*, 24 Cal. 3d at pp. 680-681, 156 Cal. Rptr. 871, 597 P.2d 130.)

To avoid the "singling out" problem, defendant suggests that CALCRIM No. 226, which specifies certain matters the jury may consider in determining the credibility of witnesses, should be amended to reflect the same substance currently conveyed in CALCRIM No. 361, and CALCRIM No. 361 itself should be jettisoned. In addition, he criticizes *Saddler*, *supra*, 24 Cal. 3d at pages 680-681, 156 Cal. Rptr. 871, 597 P.2d 130 and *Rodriguez*, *supra*, 170 Cal. App. 4th at pages 1067-1068, 88 Cal. Rptr. 3d 749, because those cases rest in part on Evidence Code section 413, which allows the fact finder to draw adverse inferences from the failure of a party to explain or deny evidence against the party. Defendant argues that however useful Evidence Code section 413 may be in civil cases, it has no place in criminal trials.

16

> These arguments are more appropriately pitched to the Legislature and the Judicial Council. We decline the invitation to engage in wholesale revision of the CALCRIM instructions and selective disabling of the Evidence Code in criminal cases just to avoid a hypothetical "chilling effect" on other defendants. CALCRIM No. 361, we hold, is not unconstitutional.

*Id.* at 495-501 (brackets added). Finally, the state appellate court determined that even if it was error to give CALCRIM No. 361 to the jury, no prejudice resulted, stating as follows:

> Defendant contends CALCRIM No. 361 was not only improperly given to the jury, but was prejudicial as to counts one and two. He does not seem to argue it was prejudicial as to count three. Nor could he support such an argument, given that he was acquitted of murder and succeeded in obtaining a voluntary manslaughter conviction for the killing of Angel-Esparza.

> The parties disagree about the appropriate standard of prejudice. Defendant insists that a *Chapman* standard is called for (see *Chapman v. California* (1967) 386 U.S. 18, 24, 87 S. Ct. 824, 17 L.Ed.2d 705), while the Attorney General points out that *Sadler* and other cases have employed the *Watson* standard (see *People v. Watson* (1956) 46 Cal. 2d 818, 836, 299 P.2d 243). (See *Saddler*, *supra*, 24 Cal. 3d at p. 683, 156 Cal. Rptr. 871, 597 P.2d 130; *People v. Roehler*, *supra*, 167 Cal. App. 3d at p. 393, 213 Cal. Rptr. 353 [courts have "rather uniformly" applied *Watson*].) Under either standard, even assuming there was error, it was harmless on counts one and two due to the overwhelming evidence against defendant, most notably his own confession.

> What occurred here bears none of the indicia of a "false confession" case.[FN 7] There was plenty of detail in the narrative defendant gave police to corroborate its reliability. Defendant knew more about the offense than the police had told him, and many of those details were confirmed by other evidence. For instance, he knew that Mancinas had borrowed a Chevrolet Tahoe from "some girl" on the night in question, which Mancinas's girlfriend confirmed. He knew the Honda used in the shooting had been stolen in Vallejo, which the owner confirmed. He knew the approximate caliber of the weapon used, which ballistics confirmed.

> [FN 7:] See Leo and Ofshe, Criminal Law: The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation (1998) 88 J. Crim. L. & Criminology 429, 436 [frequently cited study of 60 false confession cases, all of which "satisf[ied] the following conditions: no physical or other significant and credible evidence indicated the suspect's guilt; the state's evidence consisted of little or nothing more than the suspect's statement 'I did it;' and the suspect's factual innocence was supported by a variable amount of evidence—often substantial and compelling—including exculpatory evidence from the suspect's post-admission narrative. For every case included . . . there was no credible evidence corroborating the defendant's 'I did it' admission or supporting the conclusion that he was guilty." (Fns.

There was also evidence independent of the confession linking defendant to the crime scene. The route defendant described traveling with his crime partners matched the route traveled by Mancinas's cell phone, as shown by cell phone records. He and Mancinas were in separate cars, and the cell phone "map" showing their movements at the time of the shooting had the two of them converging precisely at the location of the shooting. Then there was the number of calls he made and who he spoke to by phone in the time just before and after the murder. Defendant failed to explain why he and Mancinas—a man defendant claimed he had heard of but did not personally know—traded 12 phone calls on the night of Tucker's murder.

The investigative technique most often recommended as a best-practices safeguard against false confessions—recording of custodial interrogations[FN 8]—was followed in this case, and the recording of defendant's confession, on video, was provided to the jury. If there was some kind of coercion or psychological dynamic explaining why defendant might falsely implicate himself in Tucker's murder, it was there in the record for him to argue. But he never did, and he makes no real effort to do so now. Defendant essentially suggests that once he realized he was likely going to prison for the killing of Angel-Esparza, his confession to the Tucker murder (and several other acts of violence) was driven by machismo. The problem with this portrayal of why he confessed is that it does not necessarily mean the confession was false. Defendant may well have incriminated himself out of machismo, but the jury clearly believed it was also true he shot Tucker.

[FN 8:] See California Commission on the Fair Administration of Justice, Report and Recommendations Regarding False Confessions (July 25, 2006) at < http://www.ccfaj.org/rr-false-official.html> [as of April 29, 2015].

The jury having watched defendant's videotaped confession, little could have been said (or left unsaid) to dilute its impact on them. To be sure, even with firsthand evidence of defendant's violent proclivities put graphically before them, the jury did not simply label him a violent man and a liar and convict him of all charges. Instead, it deliberated for more than 30 hours to arrive at a split verdict, which suggests it believed his testimony about the death of Angel-Esparza up to a point. His complete denial of knowledge of the Tucker murder, however, appears to have been a bridge too far. He admittedly knew too much about the crime to have any credibility in denying all involvement.

Finally, we evaluate the impact of CALCRIM No. 361 in the context of the instructions as a whole, starting with the carefully constructed internal balance to No. 361 itself. CALCRIM No. 361 does not direct the jury to draw an adverse inference. It instructs the jury that failure to explain or deny alone is not a sufficient basis upon which to infer guilt, and it highlights the prosecution's burden to prove guilt beyond a reasonable doubt. (*People v. Lamer* (2003) 110 Cal. App. 4th 1463, 1472-1473, 2 Cal. Rptr. 3d 875; *People v. Ballard*

(1991) 1 Cal. App. 4th 752, 756-757, 2 Cal. Rptr. 2d 316.) Ultimately, the instruction leaves the "meaning and importance" of the failure to explain or deny in the jurors' hands. (CALCRIM No. 361.) It is also notable that the trial court told the jury here that not all the instructions were necessarily applicable (CALCRIM No. 200), and advised jurors to follow the instructions that applied to the facts determined by them, thereby "mitigat[ing] any prejudicial effect" related to the giving of CALCRIM No. 361, if it were deemed to be improper. (*People v. Lamer*, *supra*, at p. 1472, 2 Cal. Rptr. 3d 875, see *Saddler*, *supra*, 24 Cal. 3d at p. 684, 156 Cal. Rptr. 871, 597 P.2d 130.)

Even assuming error in the giving of CALCRIM No. 361, the error was harmless on this record. Given the strength of the evidence against defendant on counts one, two and three, we cannot imagine this jury would have entertained any reasonable doubt about his guilt on any of those counts even if CALCRIM No. 361 had not been given.

*Id.* at 501-03.

**B.    Applicable Federal Law**

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings. *See Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). To obtain federal habeas relief for error in the jury charge, the petitioner also must show actual prejudice from the error, i.e., that the error had a substantial and injurious effect or influence in determining the jury's verdict. *See Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (per curiam) (citing *Brecht*, 507 U.S. at 637). The error may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. *See Estelle*, 502 U.S. at 72. The federal habeas court must defer to a state court's reasonable application of these principles. *Smith v. Spisak*, 558 U.S. 139 (2010); *Waddington v. Sarausad*, 555 U.S. at 191.

The exception to the bar on habeas relief for faulty jury instructions is "'whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process.'" *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (quoting *Estelle*, 502 U.S. at 72). "[I]t must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment." *Cupp v. Naughten*, 414 U.S. 141, 146 (1973). A federal court examining a federal habeas petition determines whether the petitioner's fourteenth amendment rights were violated due to instructional error by looking at the total context of events at trial: "not

only is the challenged instruction but one of many such instructions, but the process of instruction itself is but one of several components of the trial which may result in the judgment of conviction." *U.S. v. Frady*, 456 U.S. 152, 169 (1982) (citing *Cupp*, 414 U.S. at 147).

The test for constitutional error is whether there is a "'reasonable likelihood'" the jury misapplied the instruction in a way that violated the Constitution. *Estelle*, 502 U.S. at 72. Under this standard, the petitioner must show more than a "possibility" of misunderstanding, *Weeks v. Angelone*, 528 U.S. 225, 236 (2000), or that the jurors "could have" misinterpreted the instructions. *Tyler v. Cain*, 533 U.S. 656, 659 n.1 (2001). The court, in making this assessment, must evaluate the challenged instruction in light of the instructions as a whole and the evidence introduced at trial, as well as the arguments of counsel, all of which may clarify the charge to the jury. *Id.*; *Middleton v. McNeil*, 541 U.S. 433, 438 (2004) (per curiam). The federal habeas court must defer to a state court's reasonable application of these principles. *Smith v. Spisak*, 558 U.S. 139 (2010); *Waddington v. Sarausad*, 555 U.S. 179, 191 (2009). If error occurred, the federal habeas court must determine separately whether it had a substantial or injurious effect on the verdict. *Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (per curiam) (citing *Brecht*, 507 U.S. at 637).

### C. Analysis

First, to the extent that Petitioner claims the trial court improperly instructed the jury with CALCRIM No. 361 because it misstates California state law, this claim is not cognizable on federal habeas review. *See Waddington*, 555 U.S. at 192 n.5 ("[W]e have repeatedly held that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Estelle*, 502 U.S, 67-68 (federal habeas relief not available for alleged errors by state court in interpretation or application of state law; federal courts are bound by state court rulings on questions of state law). Because claims for error in jury instructions generally present state law questions, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle*, 502 U.S. at 72; *see also Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975) ("[S]tate courts are the ultimate expositors of state law[.]").

Petitioner nonetheless contends that the trial court improperly instructed the jury with

CALCRIM No. 361 in violation of his Fifth and Fourteenth Amendment rights.  Concerning his allegation that the instruction violated his Fifth Amendment right, Petitioner's argument fails. CALCRIM No. 361 is a permissive instruction; it allows, but does not require, that the jury consider the failure to deny.  3CT 643; 8RT 2137.  As the state appellate court observed, "CALCRIM No. 361 rests on the logical inference that if a person charged with a crime is given the opportunity to explain or deny evidence against him but fails to do so (or gives an implausible explanation), then that evidence may be entitled to added weight." *Vega*, 236 Cal. App. 4th at 496 (citing *Saddler*, 24 Cal. 3d at 675, 679).  Moreover, as the state appellate court stated, "when a defendant does testify, all bets are off.  He waives his Fifth Amendment privilege and is subject to cross-examination just as any other witness is." *Id.* (citing *Saddler*, 24 Cal. 3d at 675, 678-81).

Petitioner further asserts that the state appellate court's

> conclusion as to constitutionality in *Saddler* and *Gutierrez* cannot be squared with this Court's caution in *People v. Harris* (1989) 47 Cal. 3d 1047, 1099[,] in that this instruction singles out the defendants['] testimony to unique and special scrutiny.  Moreover, by singling out the defendant's testimony for special scrutiny, CALCRIM No. 361 is inconsistent with the dictate of CALCRIM No. 226 that the jury "must judge the testimony of each witness by the same standards." (3CT 635-637).

Dkt. 1 at 12 (brackets added); *see also* 3CT 635-637; 8RT 2124-2136.  However, this Court notes that Petitioner has cited no Supreme Court cases that clearly establish a constitutional prohibition on such an instruction.  *See* Dkt. 1.  Thus, it was not unreasonable for the state appellate court to decline to apply a rule that has not been "squarely established" by the Supreme Court.  *See Harrington*, 562 U.S. at 101.

Petitioner next contends that:

> [b]ecause this instruction can have such a unique and detrimental impact on the defense case, the existence of the instruction can have a chilling [e]ffect on the constitutional right of the defendant to testify, knowing that his or her testimony will be subject to the injected into the case by this instruction.  (*see People v. Haynes* (1983) [148] Cal. App. 3d 1117, where the Court of Appeal found substantial problems with CALJIC No. 2.62 and the court suggested that the instruction should not be given on request of the prosecutor unless he presented a significant omission by the defendant in explanations or denials in regard to the evidence in the particular case.)

Dkt. 1 at 12 (citations in original) (italics added). However, as Respondent properly notes, Petitioner again cites no United States Supreme Court cases that clearly establish such principle. Dkt. 12-1 at 18; *see also* Dkt. 1 at 11-12. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." *Harrington*, 562 U.S. at 101.

In response to Petitioner's claim that use of the CALCRIM No. 361 instruction violated his Fifth and Fourteenth Amendment rights and further, that it "serves no good purpose when its concept could be imported into the neutral CALCRIM No. 226, but it do[es] harm of constitutional dimensional by impinging on a criminal defendant['s] right to testify and to have a fair trial[,]" *see* Dkt. 1 at 13, the state appellate court stated the following:

> These arguments are more appropriately pitched to the Legislature and the Judicial Council. We decline the invitation to engage in wholesale revision of the CALCRIM instructions and selective disabling of the Evidence Code in criminal cases just to avoid a hypothetical "chilling effect" on other defendants. CALCRIM No. 361, we hold, is not unconstitutional.

*Vega*, 236 Cal. App. 4th at 499-500. Again, the state appellate court's decision on matters of state law is binding on this Court. *See Estelle*, 502 U.S. at 67-68 (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Lopez v. Schriro*, 491 F.3d 1029, 1043 (9th Cir. 2007) ("[S]tate courts are presumed to know and correctly apply state law."). Furthermore, as Respondent correctly notes in its Answer, "the clearly established principles governing instructional error claims . . . focus on whether the *jury* misapplied the instruction in an unconstitutional way, and *not* on whether the instruction impacted the defendant's decision to testify." Dkt. 12-1 at 18-19. This Court agrees with Respondent. Here, the instruction clearly told the jury that Petitioner's failure—if any—to deny was insufficient to show guilt. 3CT 643; 8RT 2137. Not only was such failure only one consideration among many, the prosecution still had to prove the existence of each element of every offense beyond a reasonable doubt, a duty reinforced by other jury instructions. *See* 3CT 632-669; *see also* 8RT 2124-2137. Jurors are presumed to follow their instructions. *Richardson v. Marsh*, 481 U.S. 200, 206 (1987). In sum, Petitioner has failed to show that there lacks a reasonable basis for the state courts to deny relief.

*Harrington*, 131 S. Ct. at 784. Accordingly, the state appellate court's rejection of the claim was not contrary to, or an unreasonable application of, clearly established Supreme Court law.

The state appellate court's rejection of the due process/fair trial portion of Petitioner's claim also was not an unreasonable application "of the more generalized, clearly-established principles governing instructional error claims set forth above." Dkt. 12-1 at 19. As Respondent provides, "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004); *accord Harrington*, 562 U.S. at 101. As noted above, the plain language of CALCRIM No. 361 clearly conveys that this is a permissive instruction. 3CT 643; 8RT 2137. Based on any reading of CALCRIM No. 361, it is further evident that the jury would have understood that it could consider whether Petitioner failed to explain or deny anything that "he could reasonably be expected to have done so based on what he knew . . . in evaluating that evidence" and weighing his testimony. 3CT 643; 8RT 2137.

Moreover, Petitioner does not deny that any failures to explain or deny adverse evidence by a testifying witness, including himself, are properly considered by a jury in determining what weight to assign such testimony. Dkt. 1 at 13; *see also Vega*, 236 Cal. App. 4th at 499 (citing *Caminetti v. United States*, 242 U.S. 470, 493 (1917) for the proposition "that an accused who takes the stand 'subjects himself to the same rule as that applying to any other witness,'" which allows the jury to draw inferences from any omission or failure to explain incriminating evidence). Petitioner further admits that an instruction informing the jury it can do just that with respect to any witness at trial is permissible. *Id.* at 12-13 (suggesting that the concept expressed in CALCRIM No. 361 could be added to another form instruction that applies to all witnesses who testify at trial). Petitioner complains instead that use of a second instruction specifically focusing the jury's attention on the *defendant's* testimony in particular is unfair. *Id.* However, as explained above, there is no reasonable likelihood the jury would have understood CALCRIM No. 361 to require they apply a different, unconstitutional standard in evaluating Petitioner's testimony as opposed to the standard required in evaluating other witness testimony under CALCRIM No. 226 ("In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or

disprove the truth or accuracy of that testimony."). 3CT 636, 643; 8RT 2128, 2137. As the state appellate court pointed out, the instruction reiterates the prosecution's burden of proof, tells the jury it "may," not "must," draw an adverse inference from a defendant's failure to explain or deny, and gives the jury absolute discretion to determine what weight to assign the testimony. *See Vega*, 236 Cal. App. 4th at 499. Respondent argues that "[t[here is simply no conceivable way the jury could have misapplied the instruction in an unconstitutional manner." Dkt. 12-1 at 20. This Court agrees with Respondent. Therefore, the state appellate court's rejection of the claim was objectively reasonable.

Lastly, the state appellate court held that:

> Even assuming error in the giving of CALCRIM No. 361, the error was harmless on this record. Given the strength of the evidence against defendant on counts one, two and three, we cannot imagine this jury would have entertained any reasonable doubt about his guilt on any of those counts even if CALCRIM No. 361 had not been given.

*Vega*, 236 Cal. App. 4th at 503. In essence, the state appellate court held that, even assuming there was either state or federal constitutional error in instructing the jury with CALCRIM No. 361, such error was harmless. *See id.* at 501-03 (noting both the *Chapman v. California*, 386 U.S. 18, 24 (1967) and *People v. Watson*, 46 Cal. 2d 818, 836 (1956), standards of harmless error review and concluding that under either the federal *Chapman* standard or state *Watson* standard, any assumed error was harmless "due to the overwhelming evidence against defendant").

In *Davis v. Ayala*, the Supreme Court held that a state court's determination that a constitutional error was harmless under *Chapman*, 386 U.S. 18, constitutes an adjudication on the merits that is subject to AEDPA deference. 135 S. Ct. 2187, 2198-99 (2015). Thus, habeas relief is unavailable unless the state court applied *Chapman* in an objectively unreasonable manner. *Id.* at 2198. Furthermore, "a prisoner who seeks federal habeas corpus relief must satisfy *Brecht*," which requires a showing that the error had a substantial and injurious effect on the verdict. *Id.* at 2199. However, formal application of both tests is not necessary where the error is plainly harmless under the more stringent *Brecht* test, which subsumes the more liberal unreasonable-application-of-*Chapman* test. *Id.* at 2198-99; *Fry v. Pliler*, 551 U.S. at 119-20.

Here, any error was plainly harmless under either standard. The record shows that the jury was presented with Petitioner's own videotaped confession, which included details of both murders not provided to him by the police. 1RT 323, 329-332; 2RT 342-343 (evidence relating to videotaped confession details on Tucker murder); 4RT 1004-1005, 1008, 1010-1011; 5RT 1018 (evidence relating to videotaped confession details on Angel-Esparza murder); *see also* 1 Amended Clerk's Transcript ("ACT") 771-877, 878-1038; 2ACT 1039-1102, 1103-1277. As to the Tucker murder, the jury was also presented with evidence corroborating Petitioner's account (from his confession), including the caliber of gun used, details regarding the borrowing and stealing of the cars used in the murder, and the route taken by Petitioner and his fellow gang members on the day of the murder. 2RT 413-414, 466-468, 471, 511-514, 523-524; 3RT 608, 610; 8RT 2063-2064; *see* 1ACT 839, 843, 846. Additionally, independent evidence was presented to the jury confirming Petitioner's participation in the Tucker murder, such as numerous phone calls between him and his fellow gang member just before and after the murder, and the converging of their cell phones at the scene of the murder. 2RT 410, 487-488, 489-490, 499, 500. As to the Angel-Esparza murder, Petitioner claimed in his videotaped confession that he acted in self-defense because Angel-Esparza attacked him with two knives. 2ACT 1210-1220, 1230-1231, 1238, 1246-1249, 1263-1268; *see also* 5RT 1032, 1052. Petitioner told police that he wrestled the first knife away from Angel-Esparza and pushed it towards him, evidently striking him with it. 2ACT 1215-1216, 1246-1247, 1249, 1267-1268; *see also* 5RT 1052. The jury was also presented with evidence corroborating Petitioner's statements to police about the stabbing: two knives found in the vicinity of the stabbing; one knife was covered in Angel-Esparza's blood and had Angel-Esparza's thumbprint (but not defendant's prints); and the other knife had no blood on it. 3RT 663-664, 669, 674, 690, 695, 701-707, 715-723, 728-729; 5RT 1036. Given this overwhelming evidence of Petitioner's guilt, the state appellate court's determination that any error was harmless beyond a reasonable doubt was not objectively unreasonable. On this record, this Court finds that any error in giving CALCRIM No. 361 to the jury was harmless because it did not have a "substantial and injurious effect or influence in determining the jury's verdict." *See Brecht*, 507 U.S. at 638.

Accordingly, Petitioner is not entitled to federal habeas relief on his instructional error claim, and the Court DENIES this claim.

## IV. CERTIFICATE OF APPEALABILITY

No certificate of appealability is warranted in this case. For the reasons set out above, jurists of reason would not find this Court's denial of Petitioner's instructional error claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Ninth Circuit under Rule 22 of the Federal Rules of Appellate Procedure. *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

## V. CONCLUSION

For the reasons outlined above, the Court orders as follows:

1. The sole claim of instructional error in the petition is DENIED, and a certificate of appealability will not issue. Petitioner may seek a certificate of appealability from the Ninth Circuit Court of Appeals.

2. The Clerk shall terminate any pending motions and close the file.

IT IS SO ORDERED.

Dated: October 24, 2017

_____
YVONNE GONZALEZ ROGERS
United States District Judge